---

### THE SIF.

#### (District Court, S. D. New York. October 18, 1907.)

COLLISION—STEAMER AND SAILING VESSEL CROSSING—NAVIGATING IN FOG.

A collision occurred near the Sandy Hook Lightship in a dense fog between a schooner and a steamship on crossing courses. The schooner was sailing on the port tack at a speed of five or six knots and sounding proper fog signals. These were not heard by those on the steamer until immediately before the collision, and were then understood as being one blast, instead of two; but the steamer at once reversed. *Held*, that she was in fault for not hearing and understanding them before, it being shown that the horn was new and of proper kind; and *held*, also, that the schooner was also in fault for going at excessive speed in the fog.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Collision, §§ 52, 152–176.

Collision rules, speed of sailing vessels in fog, see note to The Mount Hope, 29 C. C. A. 368.]

In Admiralty. Suit for collision.

Peter S. Carter, for libellants.

Butler, Notman & Mynderse, for claimant.

ADAMS, District Judge. This action was brought by Stephen W. McDonough et al. against the steamship Sif, to recover for damages caused to the schooner Annie R. Lewis and her cargo, by a collision which occurred between the vessels about noon on the 27th day of May, 1906, near the Sandy Hook Lightship. The libellants also seek recovery for the loss of the personal effects of the crew. The total claims, including salvage service, amount to about $9,000. The vessels came together by the Sif striking the Lewis a head on blow on her starboard side about amidships, with the result of injuring her to such an extent that her master and crew abandoned her and were taken on the Sif. Before they left, however, the schooner was anchored and subsequently picked up and brought into New York.

The Lewis was a 3 masted schooner 118 feet long and 32 years old at the time of the collision but fairly well kept up. She was laden with lumber at York River, Virginia, and was bound to New Haven, Connecticut. The account she gave in her libel of the matter was as follows:

"Third:—That upon information and belief, on the 27th day of May (Sunday), 1906, about noon, the said schooner was on her port tack, close hauled,

and about a mile and a half southeast of Sandy Hook Lightship, heading about for Scotland Lightship, and on a course about west half south, magnetic, with the wind about south southwest and fresh, making about four and a half (4½) miles an hour; it was a little foggy at the time, but vessels could be seen a good distance ahead, or on either side of said schooner. The said schooner was a three masted vessel and had at said time her flying jib and jib set, her foresail, mainsail, and spanker set with one reef; her three topsails and outer jib were furled, and a proper lookout kept. The fog horn was being sounded by giving two blasts at short intervals, indicating that the schooner was upon her port tack. While proceeding on said course a steamer was seen upon the beam, and coming towards said schooner. At that time and for some time previous thereto the fog signals on board of said schooner were being blown. When said steamer was seen her one whistle could be heard. Said schooner continued on her course, and said steamer made no change in her course, but continued to come rapidly towards said schooner, until just within a short time of the collision, when the heading of the steamer seemed to change from starboard to port, but said steamer continued to come ahead and struck the said schooner, head on, on her starboard side just forward of the main rigging, smashing in the starboard side and breaking the mainmast, and that on account of the high rate of speed at which the said steamer was going at the time of the collision, and the great force and violence of the blow, the port side of said schooner was shoved out.

The said schooner immediately commenced to leak, and as she could not be kept free of water the crew was taken off of said schooner by the said steamer, which proved to be the 'Sif', and taken to Baltimore, but before the crew left said schooner the master gave orders to have the schooner anchored and her lower sails furled, and the port anchor was put down with about twenty-five (25) fathoms of chain out. When said master had said schooner anchored, and left her, it was his intention, on his arrival at Baltimore, to cable C. W. Crane & Co., of New York City, the representatives of said schooner, inform them of the collision and give the location of the vessel so that they could engage and send out a powerful steamtug, equipped with wrecking apparatus, to bring in said schooner.

Fourth:—That said collision and damages were not caused through any fault or want of care on the part of the master or persons in charge of said schooner, but were caused through the negligence and want of care on the part of the persons in charge of and navigating the steamer 'Sif':

1st: That said steamer, under the rules of navigation, should have kept away from said schooner, as said schooner was privileged, being a sailing vessel;

2nd: That said steamer should not have attempted to cross the course or bow of the said schooner, believing that said schooner was going at a lower rate of speed than she was, and that he would have sufficient time to cross the course and bow of said schooner;

3rd: That said steamer should have gone under the stern of the said schooner, as she had ample sea room to do so;

4th: That said steamer should not have continued on her course at the high rate of speed at which she was going, and the person in charge of her navigation should, or ought to, have known that said schooner was a sailing vessel by hearing her fog horn, and from the direction of the wind should have known the course of said schooner, as well as what tack she was on;

5th: For not maintaining a proper lookout and not being properly manned, and going at such a high rate of speed before and up to the time of the collision;

6th: That said steamer, before approaching said schooner, should have stopped and backed until said schooner had passed ahead and away from said steamer."

It appears that the Sif was bound from New York to Baltimore in ballast. She was a steel Norwegian steamer 335 feet long and 47 feet beam. She was steered by a wheel in the centre of a flying bridge about amidships. Orders to the engine room were given by

an ordinary telegraph located about 8 feet to the starboard of the wheel. The cord used to operate the steam whistle was in front of the wheel. She had a full complement of officers and crew, of which the second officer was on the bridge with a man at the wheel. A lookout was stationed forward. A Sandy Hook pilot had brought her from Brooklyn and been discharged shortly before the collision. Her ordinary full speed was about 10 knots but on this occasion, being in ballast, a portion of her screw was exposed and while she was proceeding at nominal half speed, owing to her propeller being about one-third out of water and steam being reduced from an ordinary pressure of 180 pounds to 160 pounds, and owing also to the prevalance of a head wind, she was quite light, with a high freeboard, and her speed was very much reduced below the ordinary. It is contended by her that she was not making more than 4 knots. Her course was south by east.

The answer of the Sif gives the following account of the collision:

"During the latter part of May 1906 the steamship Sif had arrived at New York from Matanzas, Cuba, laden with a full cargo, which was discharged at New York. On the morning of 27 May the Sif left New York bound for Baltimore, Maryland, in ballast, in charge of a competent Sandy Hook pilot. Her master and second officer were on the bridge in charge of her navigation, a vigilant lookout attentive to his duties was stationed on the forecastle head near the stem and a competent wheelsman was at the helm. On leaving Erie Basin and while proceeding down the Bay the weather was cloudy with a light rain; after passing Sandy Hook the Sif encountered a thick fog. A stiff southerly breeze was blowing against the steamer and after the pilot left the Sif she encountered a heavy head sea as she proceeded on her course of S by E· at moderate speed, sounding her fog signal at frequent and regular intervals.

At about 11:45 A. M. the fog whistle of the Sandy Hook lightship was heard about abeam and estimated to be about 1½ miles distant. About 11:56 A. M. the faint sound of a single blast of a horn was heard off the port bow of the steamer by the lookout and second officer, promptly reported by the lookout by two strokes on the bell; the second officer was about to blow the steamer's fog whistle when the faint sound of the horn was heard. He therefore promptly answered the single blast of the horn by one blast of the steamer's whistle and immediately put the engine-room telegraph at full speed astern, which order was promptly obeyed in the engine-room and the engines of the steamer were immediately reversed at full speed. The faint sound of the horn aforesaid was heard by those on the steamer as soon as its strength and existing conditions permitted.

As the engines of the steamer were reversed the dim outlines of a schooner's sails became visible over the port bow of the steamer and about two of the latter's lengths distant, and it was seen that a three-masted schooner on the port tack was proceeding across the steamer's course and heading about W N W. Said schooner was seen by the lookout and officer on the steamer's bridge as soon as the dense fog permitted. The schooner was running at a high rate of speed, namely, about 7 knots per hour, under full canvas with the exception of her mizzen gaff topsail. When the engines of the steamer were in reversing motion the schooner gave several rapid blasts on her horn.

. Under the influence of her reversing engines the bow of the Sif swung considerably to starboard and at the time of the collision her headway was nearly stopped. The bow of the steamer came in contact with the starboard side of the schooner about amidships, inflicting some damage.

Said collision occurred about 11:59 A. M.

After the collision the steamer and schooner anchored near each other and a boat was launched from the steamer. The wind and sea were so heavy that when the schooner's boat reached the steamer and the latter's boat returned

to the Sif, the steamer's anchor was hove up and she was laid across the seas in order that the boats might be hoisted aboard in the lee of the steamer. The steamer stood by the schooner until the afternoon, when the fog cleared away and the Sandy Hook light ship was visible about a mile distant. Under the force of the heavy wind and sea the schooner began to drag her anchor and her master refused the offer of the captain of the Sif to place him on board the schooner.

Fifth: Claimant denies that said collision was caused by any fault or neglect on the part of the steamer Sif or her navigators and denies each and every charge and allegation of fault in the fourth article of the libel contained. Claimant, on the contrary, avers that said collision occurred without fault or neglect on the part of the steamer Sif and those in charge of her navigation, in spite of the exercise of all reasonable care on their part, and was wholly due to and caused by the following, among other, faults on the part of the schooner Annie R. Lewis and those in charge of her, to-wit:

(1) In that said schooner was proceeding in a dense fog at an excessive and high rate of speed;

(2) In that said schooner, although navigating in a dense fog, did not proceed at a moderate rate of speed;

(3) In that said schooner did not, upon encountering fog and while proceeding through it, shorten sail and slacken her speed;

(4) In that said schooner was not provided with a proper or sufficient mechanical fog horn, as required by law;

(5) In that said fog horn was not sounded at the regular intervals required by the regulations;

(6) In that said schooner while proceeding on the port tack did not give the fog signal required by the rules, to-wit, two blasts, but, on the contrary, gave a fog signal of one blast, which would indicate to other vessels that she was proceeding on the starboard tack;

(7) In that said schooner by giving a single blast on her fog horn deceived the navigators of said steamer as to the schooner's course and direction;

(8) In that said schooner when said vessels came in sight of each other did not alter her helm and cooperate with the steamer in avoiding collision;

(9) In that said schooner did not maintain a proper or sufficient lookout, and in such other and further particulars as the claimant may be able to point out upon the trial."

The testimony does not seem to establish a great rate of speed on the part of the steamer, but it was probably about 4 knots.

The steamer's testimony seeks to show that the schooner was carrying more sail than she admitted, the steamer's witnesses claiming that her topsails were seen, except the mizzen, while the schooner's witnesses say that the outer jib and topsails were furled some time before the collision. I think the schooner's account should be accepted. It seems that she was carrying a jib, flying jib, foresail, mainsail and spanker, the latter having a single reef in it.

A sharp conflict of testimony existed with respect to the schooner's fog horn, she claiming that it was in good order, while the steamer on the other hand contended that it was not in effective condition and could be heard only a short distance. It appeared that it was a standard mechanical fog horn, in use but a few months and in good order. She had been blowing it on her forecastle head in various ways during the morning, three blasts when she was sailing free, one blast when on the starboard tack and two blasts when on the port tack. During the latter she was on a course of west ½ south. She had been on the port tack for some two hours before the vessels approached each other. The horn had been in use since midnight and blown in the different ways, but when the vessels were

getting near each other, signals of two blasts only were being given. These the steamer should have heard but did not. Her navigating officer, the second mate, said that the only blast he heard before the schooner came in sight was a faint single blast ahead, from which he supposed the sailing vessel was on the starboard tack and would go clear, nevertheless he answered with one blast and stopped and reversed, which had the effect of slowing the steamer and throwing her head to the starboard. The collision then ensued, the steamer penetrating into the hull and cargo of the schooner about 4 feet and shoving her port side out a foot or more. The steamer before the collision was sailing on a south by east course.

None of the witnesses on the vessels were produced in court, except the master of the schooner, who did not make a very favorable impression as he persisted in saying that the fog was light when the great preponderance of the testimony shows it was thick. The steamer's contention with respect to the thickness of the fog should be sustained, however, it does not exonerate but rather tends to inculpate her, because under such circumstances she does not seem to have been taking all the precautions she should with regard to ascertaining about the other vessel in her course. The claim by the steamer is that when she heard from the schooner it was almost immediately prior to the collision and was a signal of one blast, which indicated that the sailing vessel was on the starboard tack and would go clear. If the steamer's testimony that only the one blast was given by the schooner and that almost immediately before the collision were to be accepted, then the fault was with the schooner and no recovery should be had here. The second mate of the steamer testified unequivocally to such effect but the steamer's testimony is not in full accord with the contention. The man on lookout said that he first heard "a weak sound of some kind of a horn" but could not locate it and for that reason did not report it; that about 1 or 2 minutes later he heard another sound on the port side and reported it by striking twice on the bell near him, indicating a vessel on the port side and he subsequently said that when she came in sight soon afterwards she was about two points on the steamer's port bow. The wheelsman also heard a "faint blast" before the signal came which was reported and acted upon by the steamer but did not notify the mate of it. The schooner's testimony concerning the number of blasts given is consistent and shows a lack of care on the steamer's part with respect to lookout and report. And considering the proper kind and condition of the horn it is scarcely to be doubted that the first signal heard on the steamer was two blasts ahead and if it had been reported and acted upon the collision would have been avoided. When the other signal came to the steamer, it was then also in time for her to have navigated efficiently if she knew or should have known what the signal was. I find it was two blasts in both instances and the steamer should have heard them and proceeded accordingly. Doubtless other signals of two blasts were given by the schooner before the collision and it was the steamer's fault that they were not heard, but taking the situation with respect to the time of hearing the signals to have been as the steamer claims, still it was sufficient to

notify her of the schooner's presence and what she was doing. The navigating officer apparently did not know of the first of the two signals nor understand what the second was and he did not give proper or timely orders to the wheelsman or the engine room with the result that an avoidable collision occurred. The steamer was therefore in fault.

It has been strongly urged that the schooner was in fault in several particulars, but these are not sustained, except with respect to speed. She claims in her libel that she was not going more than 4½ knots but the testimony shows a higher rate. Her lookout when asked on his direct examination, what speed she was making through the water said "I should think about five knots." On his cross examination, he said "between five and six." The wheelsman said: "She had about five knots, I should judge. * * * She was in the wind with a good full; her sails full." The master of the schooner, in a conversation with the master of the steamer after the collision, estimated the speed of his vessel to have been 6 knots. There was a strong breeze from the southward. The master of the schooner said it was of 12 knots strength. With the sail she carried, the schooner would naturally be going faster than he was willing to concede. Assuming that she was making between five and six knots, the speed was too great in view of the density of the fog and no doubt contributed to the damage she received. She should also be condemned.

There will be a decree for the libellants for half damages, with an order of reference.